VIRGINIA:

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

| | | |
|---|---|---|
| **MINNESOTA LAWYERS MUTUAL** | ) | |
| **INSURANCE COMPANY** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: <u>1:08 cv 1020- LO/TCB</u>** |
| **v.** | ) | |
| | ) | |
| **ANTONELLI, TERRY, STOUT &** | ) | |
| **KRAUS, LLP, et al.** | ) | |
| **Defendants.** | ) | |

## PLAINTIFF MINNESOTA LAWYERS MUTUAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, Minnesota Lawyers Mutual Insurance Company, by counsel, by and for its support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, states as follows:

## I.   INTRODUCTION AND BACKGROUND

This is a case involving whether an insurer of an attorney, Donald E. Stout ("Stout"), and his law firm, Antonelli, Terry, Stout & Kraus, LLP ("Antonelli"), has a duty to defend Stout and Antonelli in a state court suit (the "Andros Suit") seeking to hold the attorney, his firm, and other defendants liable for damages in excess of $600 million. The lawsuit is about as far removed from a legal malpractice claim as could be imagined: the attorney and his firm are not alleged to have breached duties to a client. Instead, all the damages in the case are alleged to arise because the attorney swindled his fellow owners and managers of a company called Telefind, Inc., out of hundreds of millions of dollars through a scheme to defraud a judgment creditor by absconding with Telefind's only assets and relocate them to a company owned and controlled by Stout. Because the Policy only covers damages due to claims resulting from the rendering of

professional services, none of the allegations in the Andros Suit even come within the Policy's coverage provisions.   But assuming _arguendo_ that allegations of lying, stealing, and hornswoggling could ever constitute damages "resulting from the rendering of legal services," these allegations fall full square within the Policy's Business Enterprise and Specific Entity Exclusions.

As set forth in more detail in the Argument below, the claims set forth in the Second Amended Complaint are expressly excluded under the Policy's Business Enterprise and Specific Entity exclusions, and in fact never come within the coverage provisions of the Policy because there is no allegation of damages resulting from the provision of professional services.

## A.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.   Minnesota Lawyers Mutual Insurance Company ("MLM") issued a professional liability policy (the "Policy") to a Virginia law firm, Antonelli, Terry, Stout & Kraus, LLP ("Antonelli"), for the policy period October 25, 2007 to October 25, 2008, with limits of liability as stated in the Declarations and as modified by the Limits of Liability Endorsement, of $10,000,000 per claim and $10,000,000 aggregate, but with a $5,000,000 per claim limit of liability for any claim made during the policy period arising out of any act, error or omission which occurred on or before October 25, 2006. See Complaint Exhibit A; Affidavit of John Moon, Esq. at ¶ 3.[1]

2.   The Defendants herein are named as defendants in the Second Amended Complaint ("Complaint") filed in Ferguson, et al. v. Stout, et al., Case No. 08-09767 CA 40 (Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida (the "state suit").[2]   In summary, the state suit alleges that Mr. Stout and his Law Firm were engaged in a fraudulent plan and

---

[1]    The Moon Affidavit is attached as Exhibit A hereto.

[2]    A copy of the Second Amended Complaint is attached as Exhibit B to MLM's Complaint for Declaratory Judgment filed herein.

conspiracy to cheat the plaintiffs (hereafter, the "Andros Plaintiffs") out of valuable rights to patents and technology (hereafter, the "Wireless EMail Technology"). Complaint at ¶¶ 31-71. The state suit alleges that Mr. Stout and the Law Firm induced the Andros Plaintiffs to give up their interests in the Wireless EMail Technology so that the patents could be transferred to NTP, Inc. ("NTP"), a company controlled by Mr. Stout and owned in part by Mr. Stout and members of the Law Firm. Complaint, ¶ 68. Mr. Stout is alleged to have falsely promised that the Andros Plaintiffs would share future benefits from the technology. Complaint, ¶ 96. Ultimately, Mr. Stout and his firm allegedly reaped immense benefits from the settlement of a patent infringement suit (the "Blackberry Suit"), with Mr. Stout alone receiving $177 million. Complaint, ¶ 81.

3.      The policy provides, in the CLAIMS-MADE PROVISIONS section, in relevant part, that in order for a claim to be covered,

> "The act, error or omission giving rise to the CLAIM must have occurred:

> (1)     during the POLICY PERIOD, or
> (2)     prior to the POLICY PERIOD and on or after the PRIOR ACTS RETROACTIVE DATE, if the INSURED had no knowledge of facts which could reasonably support a CLAIM at the effective date of this POLICY.

> A CLAIM is deemed made when:

> * * *

> (3)     an act, error or omission by any INSURED occurs which has not resulted in a demand for DAMAGES but which an INSURED knows or reasonably should know, would support such a demand."

4.      The Policy further provides, at Page 2, in relevant part, that:

> "CLAIM(S) means:

> * * *

(3)   An act, error or omission by any INSURED which has not resulted in a demand for damages but which an INSURED knows or reasonably should know, would support such a demand.

5.   The Policy further provides, at Page 3, in relevant part, that:

"This policy does not afford coverage for the following:

(1)   any CLAIM for DAMAGES arising out of the dishonest, criminal, malicious, or deliberately fraudulent act, error or omission of the INSURED . . .

* * *

(3)   any CLAIM arising out of PROFESSIONAL SERVICES rendered by any INSURED in connection with any business enterprise:

(a)   owned in whole or in part;
(b)   controlled directly or indirectly; or
(c)   managed

By any INSURED, and where the claimed DAMAGES resulted from conflicts of interest with the interest of any client or former client or with the interest of any person claiming an interest in the same or related business or enterprise"

6.   The Policy includes a "Specific Entity Exclusion Endorsement" that provides:

"Any CLAIM resulting from any act, error or omission arising out of rendering or failing to render PROFESSIONAL SERVICES to or on behalf of the following individual(s), business enterprise(s) or organization(s):  "NTP Incorporated"

7.   The Policy further provides, at Page 6, in relevant part, that:

"In the event of a CLAIM, * * * the INSURED must:

(1)   give immediate written notice to US" . . . .

### 1.   Allegations of the Andros Complaint

8.   The Andros Complaint alleges the following:

a.   Andy Andros ("Andros"), whose estate is one of the plaintiffs in the state suit, formed Telefind Corporation ("Telefind").  Andros Complaint ¶ 23.  An investor group, the "Richards Investors", who make up the remaining plaintiffs below, invested $5.6 million in

Telefind. Id. ¶ 24.  Mr. Stout represented Telefind; and Mr. Stout and certain partners at the Law Firm were investors in Telefind. Andros Complaint ¶ 29.

      b.      Telefind developed the Wireless Email Technology with funding by the Richards Investors.  Andros Complaint ¶¶ 39-40.

      c.      At a time when Telefind was in negotiations with certain companies that were interested in the Wireless Email Technology, Mr. Stout and Telefind were concerned that such technology would be seized by a secured creditor of Telefind.  Andros Complaint ¶¶ 32, 34, 43. Stout, who was Telefind's lawyer, Andros Complaint ¶ 43, devised a "legal strategy" that he told Andros and the Richards Investors would "legally protect [their] interest in the Wireless Email Technology", Andros Complaint ¶¶ 52-53.  The strategy was to have other persons obtain patents for the Wireless Email Technology "and then assign those patents to a new company formed by Stout".  Id. ¶ 55.  Stout advised Andros and the Richards Investors that they should not have any documented ownership interest in the technology.  Andros Complaint ¶ 57. "Andros and the Richards Investors accepted this legal advice from Stout, subject to an understanding that they would continue to participate in any benefits associated with the Wireless Email Technology", id.

      d.      Stout filed patent applications related to the Wireless Email Technology (the "Wireless Email Patents"), editing out any references to Telefind.  Andros Complaint ¶ 59. Later, Stout and another individual, Thomas J. Campana, Jr. ("Campana") made a filing with the Patent Office "showing that *they* both held an interest in the Wireless Email Technology." Andros Complaint ¶ 60.  Thereafter, Telefind's secured creditor obtained a $3.8 million judgment against Telefind but was unable to locate any assets against which to enforce the judgment. Andros Complaint ¶ 61.

e.     Stout, Campana, and an agent for the Richards Investors, Bill White ("White") incorporated NTP, Inc. ("NTP"), *a company owned in part by Stout and attorneys at the Law Firm,* and transferred the Wireless Email Patents to NTP.  Andros Complaint ¶ 68 (emphasis added).

f.     Litigation later ensued between Telefind's judgment creditor and NTP.  "In support of NTP's claim of ownership" of the Wireless Email Patents, Stout "requested that Andros sign an affidavit stating that Telefind had no ownership interest in the Wireless Email Patents".  Andros Complaint ¶¶ 70-71.

g.     In 2001, NTP brought a patent infringement suit against Research in Motion Ltd. ("RIM"), relating to RIM's Blackberry system, and obtained a $612.5 million settlement. Andros Complaint ¶¶ 80-81.  Stout then reneged on the agreement to share benefits from the technology with Andros and the Richards Investors.  Andros Complaint ¶¶ 82-83.  In doing so, "Stout and his Antonelli partners breached [a] relationship of trust and confidence when they put their own interests above those of Andy Andros and the Richards Investors".  Andros Complaint ¶ 96.

## 2.     Notice of Claim to MLM, and MLM Reservation of Rights

9.     MLM received its first notice of the Underlying Suit on August 15, 2008, when the Law Firm provided MLM a copy of the Second Amended Complaint filed in <u>Ferguson, et al. v. Stout, et al.</u>, and requested a defense **only of the Law Firm**.  Moon Aff. ¶ 5.  Mr. Stout was a named defendant in the lawsuit since it was filed on February 22, 2008, but had never reported the suit or the claim to MLM.  Moon Aff. ¶ 6.[3]

---

[3]     A copy of the original Complaint was attached as Exhibit B to Affidavit of Brian J. Gerling, attached to the Motion to Dismiss or Stay Plaintiff's Declaratory Judgment Action.  <u>See</u> Document 14-3.

10.     MLM issued a reservation of rights advising the Law Firm and Mr. Stout that it would bring a declaratory judgment action with respect to whether MLM had a duty to defend Mr. Stout and the Law Firm, and that it would provide a defense to the Complaint subject to the reservation of rights, including the right to withdraw such defense and to recoup from its insureds all amounts paid as indemnity or defense costs under the Policy upon a court's declaration that MLM did not owe a duty to defend. Moon Aff. ¶ 7.  Thereafter, MLM issued a supplemental reservation of rights as to late notice regarding the claims against Mr. Stout. Id.

11.     To date MLM has not required the defense of Antonelli and Stout to be assumed by counsel appointed by MLM.  It has been necessary for MLM to engage in extensive reviews of defense charges and underlying pleadings in order to verify that fees and costs incurred are reasonable and necessary to the defense, and to monitor the impact of such fees and costs on amounts remaining                ssible indemnification.  Such reviews have been made more difficult by the failure to receive c      invoices and pleadings.  Had MLM been timely informed of the original complaint, MLM would have appointed defense counsel as to Antonelli and Stout only and would have requested case evaluations and invoices in accordance with MLM's practice and procedures. Moon Aff. ¶ 7.

## B.     STANDARD ON SUMMARY JUDGMENT

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  All evidence should be viewed in the light most favorable to the non-moving party. See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir.1990).

Disposition on summary judgment is particularly appropriate in insurance "duty to defend" cases, given that the court is limited to consideration of the policy and the allegations of the underlying complaint. See St. Paul Reinsurance Co. Ltd. v. Ollie's Seafood Grille and Bar, LLC, 242 F.R.D. 348, 352 (D.S.C. 2007) ("In a declaratory judgment action, an insurance carrier may appropriately move for summary judgment to determine whether it is obligated to provide coverage to an insured, where, as here, there are no material ambiguities in the policy. In order to make a declaration regarding the insurer's duty to defend and indemnify the underlying suit, the court need only consider the plain terms of the Policy and the allegations and claims asserted in the underlying lawsuit."), aff'd, St. Paul Reinsurance Co., Ltd. v. Riviello, 296 Fed.Appx. 377, 380, 2008 WL 4636182, * 2 (4th Cir. Oct. 20, 2008).

## C.   STANDARDS UNDER VIRGINIA LAW FOR INTERPRETING INSURANCE CONTRACTS

In analyzing the duties of the parties, the Court construes the insurance policy "in light of the words the parties have used", and is "bound to say that the parties intended what the [Policy] plainly declares." Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 240 Va. 457, 460, 397 S.E.2d 876, 878 (1990) ("It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to, as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares"). See also KBS, Inc. v. Great American Ins. Co., 2006 WL 3538985, at *6 (E.D. Va. Dec. 7, 2006) ("Under Virginia law, it is a function of the court to construe the language of the insurance policy as written, without reforming the contract different from that plainly intended by the parties, thus creating a liability not originally assumed by the insurer"); Virginia Farm Bureau Mut. Ins. Co.

v. Williams, 278 Va. 75, 81, 677 S.E.2d 299, 302 (2009) ("When a disputed policy term is

unambiguous, we apply its plain meaning as written").

## II.   BECAUSE NO SET OF FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT WOULD, IF PROVEN, LEAD TO DAMAGES COVERED UNDER THE POLICY, MLM HAS NO DUTY TO DEFEND OR INDEMNIFY STOUT OR HIS FIRM.

To determine whether an insurer has a duty to defend, a court applies the "eight corners

rule" (four corners of the policy and four corners of the complaint) and looks solely at the policy

language to ascertain the terms of the coverage and at the allegations in the underlying action to

determine whether any claims alleged therein are covered by the policy. See America Online,

Inc. v. St. Paul Mercury Ins. Co., 207 F.Supp.2d 459, 465 (E.D. Va. 2002).

### A.   COVERAGE IS EXCLUDED BY THE BUSINESS ENTERPRISE EXCLUSION: BACKGROUND

Assuming arguendo that the claims in the Second Amended Complaint could be

characterized as seeking damages resulting from the rendering of professional services, legal

malpractice claims, there is no coverage for such by virtue of the Policy's "business enterprise"

exclusion, Exclusion (3) of the Policy.

Exclusion 3 of the Policy excludes from coverage "any CLAIM arising out of

PROFESSIONAL SERVICES rendered by any INSURED in connection with any business

enterprise: (a) owned in whole or in part; (b) controlled directly or indirectly; or (c) managed,

[b]y any INSURED, and where the claimed DAMAGES resulted from conflicts of interest with

the interest of any client or former client or with the interest of any person claiming an interest in

the same or related business or enterprise".

Thus, coverage does not extend to "any claim … **in connection with any business**

**enterprise … owned … controlled … or managed by [the Firm or Stout]"** and which results

in damages **"from conflicts of interest with any ... former client or with the interest of any person claiming an interest in the same or related business enterprise."**

Consistent with the business enterprise exclusion, the Second Amended Complaint sets forth, at great length, the history of (i) **Insureds' ownership, management and control of business enterprises** together with the Plaintiffs (Telefind and Flatt Morris), (ii) the **Insureds' ownership, management and/or control of business enterprises (Telefind, Flatt Morris, NTP, Inc.) in conflict with the alleged interests of the Plaintiffs in the same or related business enterprises (Telefind, Flatt Morris)**, and (iii) the alleged damages to Plaintiffs arising out of the Insureds' scheme through these various business enterprises to obtain sole control over the Wireless Email Patents and the Paging Patents and to reap the great financial reward associated with them, in obvious conflict with the interest of the Plaintiffs.

### 1.    The Insureds' Ownership/Management of Telefind

The Second Amended Complaint alleges that the insureds were **equity investors in Telefind**, and that at least one insured, Stout, acted as a **manager of Telefind**.  The insureds are alleged to have expanded their equity ownership interest on two occasions, the latter by acquiring a majority interest in a separate company, Flatt Morris, which itself was an equity owner of Telefind.   Relevant allegations of the Second Amended Complaint include the following:

\*      **Andy Andros formed Telefind Corporation**.  Second Amended Complaint ¶ 23.

\*      **An investor group, the "Richards Investors", invested $5.6 million in Telefind**. Id. ¶ 24.

\*      In 1987, the Firm and Stout not only provided legal services to Telefind, but became **equity investors** in that company, which was originally owned by the Plaintiffs. See ¶¶ 23-24, 29 of the Second Amended Complaint. See also ¶ 44, describing further

investments by Stout as "additional equity".[4]   Stout ... became increasingly immersed in counseling regarding the strategy and operations of the company.... See ¶ 29.

\*      Stout became more actively involved in the **management** of Telefind, recommending "that he and an inner circle of investors comprise a '*hands on management committee*' responsible for steering Telefind's course toward a possible acquisition." See ¶ 36 of the Second Amended Complaint.

\*      Stout played an active role in Telefind's search for telecommunications suitors and additional sources of funding. See  ¶ 38 of the Second Amended Complaint.

\*      In **1990**, "Stout and his law partners at [the Firm] showed their continued confidence in Telefind and the value of its technology, notwithstanding the company's cash flow difficulties, by **investing additional equity**, including the conversion of some loans to equity. **Antonelli's role was becoming increasingly blurred with their role as investors in the company.**" See ¶ 44 of the Second Amended Complaint

\*      Originally, Campana was listed as a patent inventor, and the Insureds were listed as patent counsel. "Shortly thereafter, Campana obtained an assignment of the patent interests ... and **Campana and Stout thereafter made a filing with the Patent Office showing that they both held an interest in the Wireless Email Patents as co-owners**." See ¶ 60 of the Second Amended Complaint.

\*      **The Insureds obtained a majority equity interest in Flatt Morris (an equity owner in Telefind and also a claimant of security interests in Telefind's Paging Patents in the 1991 Telefind bankruptcy)** by (1) funding the litigation against Computer Leasco for an interest in the Paging Patents in exchange for an ownership interest, ¶ 65 of the Second Amended Complaint, (2) by diluting the Plaintiffs' ownership interest through an "extraordinary multiple ... applied to their investment ... in Flatt Morris", Id., capital calls and contributions of deferred legal fees, ¶¶ 66-67 of the Second Amended Complaint.

## 2.      The Insureds' Ownership Interest in Flatt Morris

As set forth above, the Second Amended Complaint alleges that certain of the plaintiffs, identified as the "Richard Investors", were equity owners of Flatt Morris, which itself was a secured creditor of Telefind, ¶¶ 24, 64.   The Stout and Antonelli allegedly had an equity ownership in Flatt Morris, which they increased to a controlling majority interest by means of

---

[4]      An Equity Investor is a person who invests money in a business and in return receives part ownership of the business.   See http://www.hjventures.com/glossary-equity-investor.html.

extracting additional equity grants as compensation for legal services to Flatt Morris, diluting the Richards Investors' interests.  ¶¶ 65-67.

### 3.    The Insureds' Ownership/Management of NTP

The Second Amended Complaint alleges that in order to defraud a creditor of Telefind, plaintiffs were persuaded by Stout to allow the patents for the Wireless Email Technology to be assigned to NTP, a company formed, owned, and head by Stout.

*    Stout devised a legal strategy that he told Plaintiffs would legally protect the Telefind investors' interests (which included the Insureds) in the Wireless Email Technology, which was at risk of being lost to Computer Leasco in connection with its 1990 collection action.  See ¶ 52 of the Second Amended Complaint.

*    Stated simply, the strategy was to have Campana and his two ESA colleagues … obtain patents for the Wireless Email Technology in their own names as inventors, **and then assign those patents to a new company formed by Stout**, ¶ 55.

### 4.    Damages Resulting from the Insureds' Conflict of Interest with Persons Claiming an Interest in the Same or Related Business Enterprise

The Second Amended Complaint alleges that plaintiffs were damaged as a result of the insureds' placing their own self-interest above that of the plaintiffs through deception, conspiracy and broken promises, notwithstanding the existence of a relationship of trust and confidence between the insureds and plaintiffs.

*    Stout devised a legal strategy that he told Plaintiffs would legally protect the Telefind investors' interests (which included the Insureds) in the Wireless Email Technology, which was at risk of being lost to Computer Leasco in connection with its 1990 collection action.  See ¶ 52.

*    The strategy was to have Campana and his two ESA colleagues … obtain patents for the Wireless Email Technology in their own names as inventors, **and then assign those patents to a new company formed by Stout**, ¶ 55, but the Plaintiffs "would continue to participate in any benefits associated with the Wireless Email Technology once the dust settled in connection with the Computer Leasco dispute." See ¶ 57.

\*      In order to implement this legal strategy, **Stout emphasized that it was important that the Plaintiffs not have any documented direct ownership interest in the Wireless Email Technology.** Id.

\*      Stout and Campana (a non-Insured Defendant) filed three patent applications … careful to remove references from the original software source code to Telefind or Telefind software engineers responsible for the creation of portions of the code. See ¶ 59.

\*      Originally, Campana was listed as a patent inventor, and the Insureds were listed as patent counsel. "Shortly thereafter, Campana obtained an assignment of the patent interests … and **Campana and Stout thereafter made a filing with the Patent Office showing that they both held an interest in the Wireless Email Patents as co-owners.**" See ¶ 60 of the Second Amended Complaint.

\*      **The Insureds obtained a majority equity interest in Flatt Morris (an equity owner in Telefind and also a claimant of security interests in Telefind's Paging Patents in the 1991 Telefind bankruptcy)** by (1) funding the litigation against Computer Leasco for an interest in the Paging Patents in exchange for an ownership interest, ¶ 65 of the Second Amended Complaint, (2) by diluting the Plaintiffs' ownership interest through an "extraordinary multiple … applied to their investment … in Flatt Morris", id., capital calls and contributions of deferred legal fees, ¶¶ 66-67 of the Second Amended Complaint.

\*      In the 1991 Telefind bankruptcy, the Insureds represented the bankrupt Telefind (which the Insureds owned in part), one of its secured creditors, Flatt Morris (which the Insureds also owned in part), while the Firm was listed as an unsecured creditor of Telefind. Further, The Insureds "**wore these conflicting hats at a time when they were implementing a legal strategy to transfer a principal asset of the bankruptcy estate (the Wireless Email Technology) into an entity that Stout controlled.**" See ¶ 64 of the Second Amended Complaint.

\*      In June 1992, co-Defendants Stout, Campana, and White incorporated NTP, Inc. listing the Firm's offices as its business address, and **they transferred the Wireless Email Patents to NTP. NTP had no employees. Shareholders in the newly formed NTP included Stout and other attorneys at the Firm and their family members.** See ¶ 68 of the Second Amended Complaint.

\*      In 1993, NTP successfully litigated against Computer Leasco over the proper owner of Telefind's intellectual property, the Wireless Email Patents. NTP prevailed. See ¶¶ 70-74 of the Second Amended Complaint.

\*      In 1994, the Insureds also obtained ownership of the Paging Patents through their company, Flatt Morris. See ¶ 77 of the Second Amended Complaint.

\*      In 2001, NTP initiated a lawsuit for patent infringement against Research in Motion Ltd ("RIM"), ¶ 80 of the Second Amended Complaint. The suit was settled for

$612.5 million.  Of that settlement amount, Stout received $177 million and the Firm "received significant monies."  See ¶ 81 of the Second Amended Complaint.

*        When the Plaintiffs claimed a portion of the Settlement Amount, Stout rebuffed their claim.  See ¶¶ 82-83 of the Second Amended Complaint.

As alleged in the Second Amended Complaint, the **Insureds owned, managed and/or controlled three related business enterprises** -- Telefind, Flatt Morris, and NTP -- over almost a twenty year period (from 1987, the time of the initial investment in Telefind, to 2006, the time of the Blackberry™ Settlement).  The alleged purpose of the Insureds' involvement in these three enterprises was to obtain sole ownership of the Wireless Email Patents (first, to Stout individually and then through NTP) and the Pager Patents (through the insureds' corporation, Flatt Morris) and to exclude the Plaintiffs from the financial benefits of the Wireless Email Patents.  The Insureds acted in concert with non-insureds, Thomas J. Campana, William C. White, William Wright, to transfer the Wireless Email Technology to a corporation owned by the Insureds and their co-conspirators. See e.g., Counts II, Count IV, and Count V of the Second Amended Complaint.

**B.        COVERAGE IS EXCLUDED BY THE BUSINESS ENTERPRISE EXCLUSION: ARGUMENT**

**1.        In Interpreting a Professional Liability Policy, the Phrase, "Arising Out Of", is Given Broad Interpretation.**

"[W]hen an insurance policy excludes coverage for claims 'arising out of' certain conduct, 'the exclusion is given a broad, general, and comprehensive interpretation.'" Continental Casualty Company v. Smith, 243 F.Supp.2d 576, 581 (E.D.La.2003), quoting Scottsdale Insurance Company v. Texas Security Concepts and Investigation, 173 F.3d 941, 943 (5th Cir.1999) and citing McDaniels v. Great Atlantic & Pacific Tea Company, 602 F.2d 78, 82 (5th Cir.1979).  "The term 'arising out of' means 'growing out of' or 'flowing from' or 'incident

14

to' or 'having a connection with.'" Continental Casualty Company v. Smith, id., citing McDaniels, supra, 602 F.2d at 82.   See also Ber etta U.S.A. Corp. v. Federal Ins. Co., 17 Fed.Appx. 250, 253, 2001 WL 1019745, 2 (4th Cir.   Sept. 6, 2001) ("Maryland courts have interpreted broadly the policy phrase 'arising out of.'   'The words "arising out of" must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like.'"), quoting N. Assurance Co. of Am. v. EDP Floors, Inc., 311 Md. 217, 533 A.2d 682, 688 (Md.1987); Eon Labs Mfg., Inc. v. Reliance Ins. Co. , 756 A.2d 889, 893 (Del. Supr.,2000) ("The term 'arising out of' is one that lends itself to uncomplicated, common understanding.").

> 2.   **The Purpose of the Business Enterprise Exclusion is to Clarify that Malpractice Policies are Intended to Insure Claims Arising out of the Practice of Law, Not the Practice of Business.**

**The Second Amended Complaint represents exactly the type of claims the business enterprise exclusion is intended to exclude: where the Insureds have erased the lines between the practice of law and the practice of business.** See Ronald E. Mallen and Jeffrey M. Smith, 5 Legal Malpractice § 36:27 (2009 ed.) (One of the purposes of this exclusion is to "avoid[] the enhanced risk that results from the blurring the lines between the practice of law and a business pursuit."); American Guarantee & Liability Ins. Co. v. Timothy S. Keiter, P.A., 360 F.3d 13, 16 -17 (1st Cir. 2004) ("business pursuits by lawyers that create conflicts between lawyers' personal interests and the best interests of their clients, such as acquiring part ownership of a client's business" are excluded).

Thus, in <u>Coregis Ins. Co. v. LaRocca</u>, 80 F.Supp.2d 452 (E.D. Pa. 1999), involving a similar business enterprise exclusion,[5] the attorney was one of three trustees for a trust formed as part of a real estate venture ("New Gretna"). When New Gretna was converted to a limited liability company, the attorney became a partner and held a 7.5% ownership interest. <u>Id.</u> at 453. Subsequently, several lawsuits were filed against the attorney alleging legal malpractice and violations of his duties as trustee and partner of New Gretna. <u>Id.</u>  Concluding that the legal malpractice claims were "closely intertwined" with the attorney's role in New Gretna "as both a partner and a trustee," <u>Id.</u> at 457, and that the legal malpractice claims as lawyer for New Gretna "simultaneously" involved the attorney's business decisions, the court denied coverage under the business enterprise exclusion.  <u>Id.</u>  When an attorney wears "two hats" – one as lawyer and the other as part owner, the business enterprise exclusion applies: "[i]t is axiomatic that a suit against a lawyer for services he provided to a business enterprise in which he was a partner is a suit that 'arises out of' and is 'in connection with' that business enterprise." <u>Id.</u> at 457, 459.

### 3. The Exclusion Applies Where the Claimed Damages Arise out of Stout's Business Practice and Not his Law Practice.

The Plaintiffs' damages in the Second Amended Complaint are directly attributable to the Defendants' refusal to share the proceeds from the Blackberry™ Settlement – not the Insureds' actions as an attorney for the Plaintiffs or Telefind.  <u>See Potomac Ins. Co. v. McIntosh</u>, 167 Ariz. 30, 804 P.2d 759 (Ariz. 1990) (analyzing the proximate cause of the plaintiffs' loss to deny coverage where the loss was attributable to business reversals not the practice of law).  The

---

[5]     That policy did not apply to "any claim arising out of INSURED'S activities as an officer, director, [or] partner, … of any company corporation … other than the NAMED INSURED" and "any CLAIM arising out of or in connection with the conduct of any business enterprise other than the NAMED INSURED … which is owned by any INSURED or in which any INSURED is a partner, or which is directly or indirectly controlled, operated or managed by any INSURED either individually or in a fiduciary capacity." <u>Id.</u> at 454.

claimed loss in the Second Amended Complaint results from fraud and breach of an oral contract to share equally any financial gain from the Wireless Email Technology, rather than the provision of legal services.

Thus, in Continental Cas. Co. v. Moser, 2006 WL 827319, 5 -6 (E.D.Ark. May 29, 2006), an "eight corners" case, coverage was excluded where attorneys "Jewell and Moser **controlled Scanning Technologies's financial transactions, funded its operations,** determined Bomar's compensation as president of Scanning Technologies, and **conducted negotiations for the potential sale of the corporation. Jewell and Moser controlled Scanning Technologies**" and where "Bomar's claims [arose] out of services performed for Scanning Technologies." Here, plaintiffs' damage claims arise solely out of alleged agreements with Telefind, the company Stout managed and had an ownership interest.

Similarly, in Continental Casualty Company v. Smith, 243 F.Supp.2d 576 (E.D.La.2003), also an "eight corners" case and one relied on expressly in Moser, the plaintiff in the underlying lawsuit sued his former attorney and the attorney's law firm, alleging that the attorney had unlawfully taken control of corporations that were owned in part by the plaintiff. Id. at 577-78. The attorney had represented both the corporations and the plaintiff, who was then the president of the corporations. Id. **The plaintiff alleged that he and the attorney agreed that the attorney would take over as president and that the plaintiff would move into a newly-created CEO position. Id. Upon becoming president, however, the attorney allegedly succeeded in taking control of the corporations and firing the plaintiff because the attorney had never amended the corporate by-laws to include the CEO position.** Id. at 578. The plaintiff filed suit in federal court, alleging, among other things, RICO violations, legal malpractice, breach of fiduciary duties, and fraud.

The court in <u>Smith</u> held that the policy's business interests exclusion was "clear and unambiguous." <u>Id</u>. at 581.[6]  The court then determined that the attorney and his firm were not entitled to either a defense or indemnification under the policy **because all of the plaintiff's allegations arose out of the attorney's "activities as president of the corporations, in anticipation of his role as president, or from legal services performed for companies that an insured managed, controlled or intended to control."** <u>Id</u>. at 582.  The defendants in <u>Smith</u> "failed to identify a single allegation in the Complaint ... that state[d] a cognizable claim independent and separable from an insured's capacity as an existing or prospective officer of the corporations or from legal representation provided to companies which an insured controlled or intended to control." <u>Id</u>.

> **4.      The Applicability of the Exclusion Does Not Turn on Whether the Insured Provided Legal Services.  Instead, the Exclusion Precludes Coverage Where Damages Arise from Stout's Business Practice and Not his Law Practice.**

The application of the business enterprise exclusion turns on the nature of the attorney's conduct. <u>See</u> Ronald E. Mallen and Jeffrey M. Smith, 5 <u>Legal Malpractice</u> § 36:27 (2009 ed.) (**"The application of a business pursuits exclusion does not depend on whether the lawyer rendered legal services"**). The Insureds' status as attorneys for the Plaintiffs does not invoke coverage under the Policy or "mandate that there be coverage for acts arising out of [their] business relationship with client" simply because the Insureds acted at one time as attorneys for Telefind.  Instead, the dispositive issue is what conduct caused resulted in the damages claimed. <u>Potomac Ins. Co. v. McIntosh</u>, 167 Ariz. At 32, 804 P.2d at 761 (citing <u>Senger v. Minnesota Lawyers Mut. Ins. Co.</u>, 415 N.W.2d 364, 368 (Minn. Ct. App. 1987) (**the mere existence of an**

---

[6]      The business interests exclusion in <u>Smith</u> excluded any claim arising out of legal services performed for entities that an insured operated, managed or intended to control.  243 F.Supp.2d at 582.

**attorney-client relationship will not be sufficient to bar the application of a relevant policy exclusion**).

Thus, in <u>Coregis Ins. Co. v. Bartos, Broughal & Devito, LLP</u>, 37 F. Supp.2d 391 (E.D. Pa. 1999) – an "eight corners" declaratory judgment action with an underlying legal malpractice claim - the court applied a similar business enterprise exclusion[7] to hold that Coregis had no duty to defend deny where the underlying litigation involved "improper conduct [by an attorney ("Bartos")] in promoting, selling, and managing interests in four limited partnerships." <u>Id.</u> at 392.

Bartos played the same aggressive business role as Stout did in the Second Amended Complaint. Bartos was a general and limited partner in four limited partnerships. He directly or indirectly controlled and managed them, and he owned an equity interest in a corporation that was a general partner of the limited partnerships. <u>Id.</u> Bartos had been the plaintiffs' attorney; but he also sold them interests in the limited partnerships. <u>Id.</u> When the limited partnerships went into bankruptcy, the plaintiffs alleged that Bartos intentionally mismanaged the limited partnerships. <u>Id.</u> Three of the nine counts against Bartos and the Firm involved legal malpractice claims related to the limited partnership activities. <u>Id.</u> at 392-393. Notwithstanding the legal malpractice claims, the court denied coverage for all of the plaintiffs' claims under the business enterprise exclusion because Bartos had the requisite ownership of and control over the limited partnerships, and the claims arose out his ownership and control over these various business enterprises. <u>Id.</u> at 394. Like Bartos, the Insureds had the requisite ownership and control of Telefind, Flatt Morris, NTP, and the Wireless Email Patents (actively pursuing that

---

[7]     The Policy exclusion in that case excluded coverage for "any CLAIM arising out of or in connection with the conduct of any business enterprise other than the NAMED INSURED … which is owned by any INSURED or in which any INSURED is a partner, or which is directly or indirectly controlled, operated or managed by any INSURED either individually or in a fiduciary capacity." <u>Id.</u> at 393.

ownership and control) and exercised that control to deny the Plaintiffs interests in the Blackberry™ Settlement.

Where the damage claims arose from risks inherent in the attorney's business pursuits as opposed to risks inherent in the practice of law, coverage was denied, notwithstanding that the attorneys provided some legal services.  In <u>Home Ins. Co. of Indiana v. Walsh</u>, 854 F. Supp. 458 (S. D. Tex. 1994) – a declaratory judgment action with an underlying legal malpractice claim -- the court applied a business enterprise exclusion because the claim arose from the insured attorneys' work performed in their capacities as owners of a bank, "not from any special risks inherent in the practice of law." <u>Id.</u> at 462.  Even though the attorneys represented the plaintiff as his attorney, the court found that the attorneys' business pursuits in two real estate transactions caused the plaintiff's damages.[8]

The Second Amended Complaint also turns on the business conduct of the Insureds in business enterprises independent of the law firm.  From the inception of the Insureds' attorney-client relationship with the Plaintiffs in 1987, the Insureds became business partners with the Plaintiffs and owners of Telefind. This initial equity involvement blossomed into "hands-on"

---

[8]     The exclusion in <u>Walsh</u> case excluded: "any claim based upon or arising out of the work performed by the Insured, with or without compensation, with respect to any corporation … business enterprise … in which the Insured has any pecuniary or beneficial interest, irrespective of whether or not an attorney-client relationship exists, unless such an entity if named in the Declarations." <u>Id.</u> at 460.
    In <u>Walsh</u>, the plaintiff and the insured attorneys purchased two adjoining parcels.  A bank, owned by the two attorneys, loaned money for one property "retaining a 25% interest in profits." <u>Id.</u> at 459.   Another bank loaned money for the other property.  The two attorneys negotiated the loan and provided guarantees to the second bank.  Both loans were defaulted on and the two attorneys declared bankruptcy.  After the second bank went into receivership, the FDIC sued the plaintiff and the two attorneys for their guarantees.  The plaintiff filed a third party claim for legal malpractice against the attorneys and their law firm.  <u>Id.</u>  The court concluded that the plaintiff's legal malpractice claims turned on the business conduct of the two attorneys as owners of the first bank, which was "a business enterprise independent of the law firm" and therefore held that the business enterprise exclusion applied. <u>Id.</u> at 461.

management and the taking over (Flatt Morris) and setting up (NTP) of additional business enterprises to secure valuable patents. The Plaintiffs complain of conduct in 2006 by a business enterprise independent of the law firm, NTP, in the company's refusal through its owners (i.e., the Insureds and other defendants) to divide the Blackberry™ Settlement proceeds. As in <u>Home Ins.</u>, the business enterprise exclusion should apply to deny coverage to the Insureds.

Although an attorney establishes a relationship of confidence and trust with his client, the business enterprise exclusion will apply to preclude coverage when an attorney pursues his self-interest through a business enterprise other than a law firm. In <u>Mt. Airy Ins. Co. v. Greenbaum</u>, 127 F.3d 15 (1st Cir. 1997) - another declaratory judgment action with an underlying legal malpractice claim - the court applied a similar business enterprise exclusion to deny coverage to a law firm and eight of its attorneys.[9] <u>Id.</u> at 21. The plaintiff in the underlying malpractice action was a passive investor in real estate partnerships with several attorneys from the firm "who entrusted [the attorneys] and the Law Firm with management and oversight of the investment business affairs." <u>Id.</u> at 17.

Over the course of five years, new partnerships were created, funded by the plaintiff and the attorneys, and operated out of the law firm's offices. <u>Id.</u> Meanwhile, the attorneys set up two close corporations for themselves and improperly funneled monies belonging to the plaintiff or the partnerships into the corporations. <u>Id.</u> at 18. The plaintiff alleged the firm and its principals took advantage of their positions as principals of the various business enterprises and as his attorney – a similar allegation of a relationship of trust and confidence was made in this case, ¶ 96 of the Second Amended Complaint – and failed to protect and disregarded his rights in the partnerships, acting instead in their own self-interest. Finding that this business enterprise

---

[9]     This case presented the court with the same exclusion as in <u>Coregis Ins. Co. v. Bartos, Broughal & Devito, LLP</u>, 37 F.Supp.2d 391, 394 (E.D.Pa. 1999).

exclusion precluded coverage for "all claims sounding in malpractice if the allegations charge wrongdoing in connection with a business in which the Insured has such an interest [i.e., ownership, management or control]," Id. at 20, and further finding that the plaintiff's claims arose out of the conduct of a business entity, in which the attorneys had the requisite ownership and control, the court held that the insurer had no duty to defend; the business enterprise exclusion applied. Id.. at 21.

Like the underlying plaintiff in Mt. Airy, the Plaintiffs assumed the role of passive investors, after the Wireless Email Patents were secured by NTP (the company formed and owned by the Insureds), receiving periodic updates throughout the balance of the 1990's on the status of the Wireless Email Patents, "trusting their fiduciaries (Stout, [the Firm], White and Campana) to keep them apprised if there were any positive developments associated with these patents." See ¶¶ 77-78 of the Second Amended Complaint. Also like Mt. Airy, the wrongdoing charged against the Insureds is the wrongful withholding of the Plaintiffs' portion of the Blackberry™ Settlement proceeds by an Insured-controlled business entity, NTP. As such, the business enterprise exclusion must apply.

> ### 5. The Exclusion Applies to Claims of Breach of Fiduciary Duty, as Such Claims Arise out of the Conflict of Interest That is the Subject of the Exclusion.

Here, plaintiffs allege that Stout engaged in a fundamental conflict of interest when he engineered the fraudulent transfer of the only assets of significance his client, Telefind, possessed, through promises to plaintiffs that Stout later reneged on, in order to steal the assets for himself. Couching such conduct as the provision of legal advice does nothing to avoid the application of the exclusion. See Continental Casualty Company v. Smith, supra, 243 F.Supp.2d at 583 ("Reuther's vague assertion that defendants did not disclose relevant information affecting

his rights in the companies is another facet of the conflict of interest claim.  It arises out of Smith Jr.'s role in the companies or the legal services performed for companies that Smith Jr. controlled or intended to control.  Otherwise, neither Smith Jr. nor Smith Martin would have had access to the information that Reuther alleges should have been disclosed.").

Moreover, in this case, the only counts of the Second Amended Complaint that allege "legal advice" by Stout also incorporate the prior allegations arising out of the attorney's business activities.  In Everest Nat. Ins. Co. v. J. Daniel Brett & Co., P.C., 2008 WL 4083175, * 3 (E.D.Pa.Aug. 29, 2008), the Court, applying Pennsylvania's "four corners" test to determine there was no duty to defend, noted "**ENIC emphasizes that the counts which the Defendants contend show 'potential' coverage [including one for legal malpractice] incorporate by reference all of the prior allegations of the complaint which include the allegations of LoStracco's dual relationships with Brett and Veneesa . . . .**"  Further, "**[t]hus, the Court is forced to conclude that all the claims in the complaint 'arise out of' the involvement of LoStracco in performing both professional services, and also serving in a capacity with Vaneesa covered by exclusion E.**"  2008 WL 4083175, * 3 (emphasis added).

      **6.**    **The Business Enterprise Does Not Have to be in Legal Existence at the Start of the Conduct.**

Here, plaintiffs allege a scheme to transfer Telefind's assets to a company that would be controlled by Stout.  While Stout had the requisite ownership and/or control of Telefind at the beginning of the scheme, in fact his management and ownership of NTP is sufficient for purposes of application of the Business Enterprises Exclusion, since the exclusion does not require that the entity be in existence at the time the purported "legal advice" was given.  See Coregis Ins. Co. v. Bartos, Broughal & DeVito, LLP, 37 F.Supp.2d 391, 394 (E.D.Pa. 1999):

23

Defendants first contend that the language of Exclusion G, which requires that the insured's activities "arise out of" or be "in connection with" the conduct of any business enterprise other than the named insured, only applies to business enterprises that are in existence at the time of the alleged malpractice.

\* \* \*

However, we agree with Coregis that the clear and unambiguous language of Exclusion G **does not require that the partnerships be in legal existence at the time the alleged malpractice occurred** in order for the exclusion to apply. *See generally Dukart v. National Union Fire Ins. Co. of Pittsburgh, PA,* 1993 WL 331175 (Del.Super. July 13, 1993) (finding that language in a similar exclusion "does not require that the act of alleged malpractice or, for that matter, any other event, such as the accrual of the cause of action or the making of a claim, occur during the existence of the legal entity used to carry on the business enterprise"). Further, Exclusion G applies to the Zajacek Plaintiffs' claims because they arise out of or are in connection with a "business enterprise other than the named insured" (DHLPs # s 2-4) in which one of the insureds (Bartos) is a partner and which is "directly or indirectly controlled, operated or managed by" one of the insureds (Bartos) "either individually or in a fiduciary capacity." (Coregis Policy Exclusion G).

37 F.Supp.2d at 394 (emphasis added).

## C.   COVERAGE IS EXCLUDED BY THE POLICY'S SPECIFIC ENTITY ENDORSEMENT.

In addition, coverage is precluded, and MLM had no duty to defend, pursuant to the Policy's Specific Entity Exclusion Endorsement excluding from coverage any claim resulting from any act, error or omission arising out of rendering or failing to render professional services to or on behalf of NTP, Inc.

According to that complaint, NTP, the company that received the transferred patents, was alleged to be owned and controlled in part by Stout and other attorneys at the Law Firm.  Second Amended Complaint ¶¶ 64, 66-67, 104, 107, 109, 126.  The Complaint alleges causes of action based on Stout's actions "[i]n support of NTP's claim of ownership" in requesting that Andros sign an affidavit stating that Telefind had no ownership interest in the Wireless Email Patents. Assuming arguendo that such conduct could ever constitute the rendering of professional

services, the Second Amended Complaint asserts damages arising out of NTP's ultimate assertion of such ownership as an element of the fraud and breach of contract in allegedly refusing to share settlement proceeds with the plaintiffs. Second Amended Complaint ¶ 71.

## III.   NO COVERAGE EXISTS UNDER THE ANDROS SUIT BECAUSE THE SUIT NOWHERE ALLEGES DAMAGES DUE TO CLAIMS "RESULTING FROM THE RENDERING OR FAILURE TO RENDER PROFESSIONAL SERVICES".

**In order to come within coverage in the first place, Stout and Antonelli must be alleged to have liability for acts arising out of the rendering of legal services.**

> The insuring agreement in the MLM policy provides that MLM will pay all sums up to the limit of liability due to a clam arising from an act or omission of the insured resulting from the rendering or failing to render legal services for others. Thus, the insurer only has a duty to defend if the complaint and other information provided to MLM fits within the insuring agreement. An insurer need not provide a defense for an insured if the charge against the insured is foreign to the risk insured against. <u>Donnelly v. Transportation Ins. Co.</u>, 589 F.2d 761, 765 (4th Cir.1978). Because the insuring agreement gives rise to coverage resulting from the rendering of legal services the court must look to the complaint to see if that conduct is alleged. Coverage turns on the nature of the insured's conduct.

<u>Bullis v. Minnesota Lawyers Mut. Ins. Co.</u>, 2007 WL 4353760 * 5 (D.N.D. Dec. 10, 2007) (citations omitted).

The Andros Suit does not state a covered claim because the alleged damages did not result from the rendering or failure to render professional services, as required by Part Two of the Policy's Coverage Section. Policy at p. 1. Any notion that the Andros Suit asserts damages based on defective legal advice is belied by the clear allegations of the Second Amended Complaint, which specifically asserts that the so-called "legal advice" was in fact statements by Stout intended to fraudulently induce Plaintiffs to give up any traceable interest in the Wireless Email Patents. <u>See</u> <u>e.g.</u>, Second Amended Complaint ¶ 109 -- **the "legal advice" given by Stout (that by giving up any traceable interest in the Wireless Email Patents, the assets of Telefind could be successfully hidden from its judgment creditor) was the fraudulent**

**statement upon which plaintiffs relied.** Since when does fraud and chicanery constitute the provision of legal services? In fact, regardless of the label given it by plaintiffs in the Andros Suit, the "advice" allegedly given by Stout is nothing more than a false statement intended to induce plaintiffs to give up their interest in the Wireless Email Patents.

Simply put, "[w]hen the fraudulent conduct of an attorney is involved, the attorney is not acting in his capacity as an attorney." Krasner v. Professionals Prototype Ins. Co. Ltd., 1993 WL 7254, * 2 (9th Cir. Jan. 13, 1993). Here, as in Krasner, Stout "was not sued by his clients or those in privity with them for any acts related to the practice of law but rather by third parties based on his allegedly intentional and fraudulent conduct." Id.[10]

Thus, in American Nat'l. Fire Ins. Co. v. Abrams, 2002 WL 243455 (N.D.Ill. 2002), clients brought claims against their attorneys for fraud and for violations of the RICO statute. "The major point of contention is whether or not the defendants were rendering professional services in their capacity as attorneys while participating in [a] scheme." The Court found it "unlikely that the parties intended the risk of the type of conduct alleged by State Farm to be covered by the policies." The Court further found "to hold otherwise would be to hold that the risk of fraud and RICO are inherent in the practice of law. This the Court cannot do." 2002 WL 243455 ** 6-7.[11]

---

[10]     Moreover, the Policy expressly excludes fraudulent acts. See Policy p. 3, Exclusion (1).

[11]     The court in Abrams cited Crum & Forster Managers Corp. v. Resolution Trust Corp., 156 Ill.2d 384, 620 N.E.2d 1073 (1993), which wrote, in a case dealing with the real estate profession, that "[a]lthough there may be a myriad of risks to which one performing services in a real estate professional capacity may be exposed, covered risks are only those which inherently arise out of the rendering of real estate services." Id. at 1078. The court then went on to hold that it was clear after a review of the allegations of the complaint that the claims did not arise out of the insured's rendition of real estate services because the complaint alleged that the insured's had committed intentional business torts and had engaged in unfair practices. The court noted, "[t]he

Similarly, the court in <u>Bullis v. Minnesota Lawyers Mut. Ins. Co.</u>, 2007 WL 4353760 (D.N.D. Dec. 10, 2007), rejected the notion that there could be coverage under a professional liability policy for an attorney alleged to have engaged in securities fraud, where the damages allegedly flowed not from the legal services provided but from the fraud.  The Court stated:

> there is coverage only for claims arising from the provision of legal services, not for claims like those in this complaint of a scheme to sell unregistered securities. The complaint alleges that Bullis is a lawyer, and his successful defense in the *Ward* action established that he was only the lawyer and not a seller or solicitor of the securities. The fact that Bullis established a complete defense to the suit for the alleged illegal securities scheme, that of factual innocence, does not make MLM responsible to defend a claim outside the scope of coverage of its malpractice policy. **The complaints do not allege any claim that Bullis was obligated to pay because of legal services he rendered or failed to render. The securities scheme as alleged did not seek damages for professional negligence and thus was not within the insurance coverage.**

Id. at ** 5 – 6 (emphasis added).

## IV. DELAY OF AT LEAST FIVE MONTHS IN REPORTING SUIT AGAINST STOUT PRECLUDES COVERAGE AS TO HIM.

It is undisputed that Mr. Stout was named as a defendant in the original complaint filed below on February 22, 2008, and in a first amended complaint filed March 22, 2008; that he gave no notice to MLM of the either of these pleadings or otherwise provided notice of the claim; and that MLM first learned of a claim against Stout on August 15, 2008, when the Antonelli firm provided MLM with a copy of the Second Amended Complaint in the context of seeking a defense only on behalf of the firm.

The Policy requires immediate notice of a claim.  Stout's delay of some five months in reporting the suit against him constitutes late notice as a matter of law and precludes coverage as to Stout.  <u>See</u> <u>e.g.</u>, <u>Yanago v. Aetna Life Ins. Co.</u>, 164 Va. 258, 178 S.E. 904 (1935) (upon

---

risk of conducting one's business in an unfair and tortious manner is certainly not one inherent in the practice of the real estate profession.  <u>Id</u>.

remanding, court stated that insured's delay to give notice for fifty-eight days would be late as a matter of law); Atlas Ins. Co. v. Chapman, 888 F. Supp. 742 (E.D. Va. 1995) (" . . . the Court finds that as a matter of law, the four month delay in notifying the insurer, without any excuse or sufficient justification, constitutes a substantial and material breach of the notice provision, which is a condition precedent to coverage."), aff'd, 92 F.3d 1176, 1996 WL 436562 (4th Cir. July 23, 1996); Lord v. State Farm Mut. Auto. Ins. Co., 224 Va. 283, 295 S.E.2d 796 (1982) (173-day delay); Liberty Mut. Ins. Co. v. Safeco Ins. Co., 223 Va. 317, 324, 288 S.E.2d 469 (1982) (51-day delay); State Farm Mut. Auto. Ins. Co. v. Porter, 221 Va. 592, 272 S.E.2d 196 (1980) (seven months).[12]

Virginia law makes compliance with a notice requirement in an insurance policy a condition precedent to coverage. Goodwin v. Union Ins. Co., 2007 WL 582931, * 6 (E.D.Va. Feb. 20, 2007), citing Atlas Ins. Co. v. Chapman, 888 F.Supp. 742, 745 (E.D.Va.1995). In Virginia, proof of prejudice to the insurer is not required in order for coverage to be precluded by the insured's failure to provide timely notice. Instead, prejudice only becomes an issue when a question arises as to the materiality of the information that is given to the insurer. State Farm

---

[12]  Jurisdictions outside Virginia have held that similar periods of delay violated the provisions of LPL policies requiring notice "immediately" or "as soon as practicable". See Chicago Ins. Co. v. Borsody, 165 F.Supp.2d 592 (S.D.N.Y. 2001) Under New York law, insured's 40-day delay in forwarding cross-claim to professional liability insurer was not justified under policy provision requiring insured to "immediately" notify insurer of every demand, notice, summons or other process. As in Virginia, New York state and federal courts have held relatively short delays in providing notice of an actual or potential claim to violate such a notice requirement. See, e.g., Goodwin Bowler Assocs., Ltd. v. Eastern Mutual Ins. Co., 259 A.D.2d 381, 687 N.Y.S.2d 126, 127 (1st Dep't 1999) (2 months). See generally American Ins. Co. v. Fairchild Indus., Inc., 56 F.3d 435, 440 (2d Cir.1995) ("Under New York law, delays for one or two months are routinely held 'unreasonable' ").

Fire & Casualty Co. v. Walton, 244 Va. 498, 504, 423 S.E.2d 188, 192 (1992).[13]  In this case,

Stout gave no notice at all.  Consequently, no coverage exists for Stout for the independent

reason of failure to give timely notice of the lawsuit against him.

## V.    CONCLUSION

For the reasons set forth above, Minnesota Lawyers Mutual Insurance Company

respectfully requests that summary judgment be entered in its favor as to the Complaint for

Declaratory Judgment.

---

[13]    Nevertheless, MLM has in fact been prejudiced in that Stout engaged counsel, without consultation with MLM, who simultaneously represent seven non-insured defendants, creating conflict risks that would not exist had MLM been provided timely notice (MLM did not seek a change of counsel given that present counsel had already been defending Stout for months), and creating additional burdens in attempting to monitor and determine the reasonableness and necessity of fees incurred on behalf of the insured defendants under the Policy, a matter of some importance given that defense costs reduce the amount available for indemnity. See Policy at p. 6, "Limit of Liability": "All CLAIM EXPENSES shall first be subtracted from the limit of liability. The remainder, **if any**, is the amount available to pay money DAMAGES." See also Policy at p. 2, defining "CLAIM EXPENSES" as defense costs.

Date:   April 9, 2010                        Respectfully submitted,

                                             MINNESOTA LAWYERS MUTUAL
                                             INSURANCE COMPANY
                                             By Counsel

SANDS ANDERSON MARKS & MILLER
A Professional Corporation


_____/s/_____
Danny M. Howell       VSB No. 30352
dhowell@sandsanderson.com
Michael T. Marr       VSB No. 48536
mmarr@sandsanderson.com
Mikhael D. Charnoff  VSB No. 43929
mcharnoff@sandsanderson.com
Jeffrey H. Geiger       VSB No. 40163
jgeiger@sandsanderson.com
1497 Chain Bridge Road
Suite 202
McLean, VA  22101
(703) 893-3600
(703) 893-8484 (fax)
*Counsel for Plaintiff Minnesota Lawyers*
*Mutual Insurance Company*

### CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

                              Lon A. Berk, Esq.
                              lberk@hunton.com
                              Brian J. Gerling, Esq.
                              bgerling@hunton.com
                              Hunton & Williams LLP
                              1751 Pinnacle Drive
                              Suite 1700
                              McLean, Virginia  22102
                              (703) 714-7400
                              *Counsel for Defendants*


                              _____/s/_____
                              Mikhael D. Charnoff