IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MINNESOTA LAWYERS MUTUAL )
INSURANCE COMPANY )
)
Plaintiff, )
)
v. ) Civil Case No.: 1:08-CV-1020
)
ANTONELLI, TERRY, STOUT & )
KRAUS, LLP, et al., )
)
Defendants. )

## MEMORANDUM OPINION

On September 30, 2008, Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM") initiated in this Court a declaratory judgment action against Defendants Antonelli, Terry, Stout & Kraus, LLP (the "Antonelli Firm"), and Donald E. Stout, Esq. ("Stout") (collectively "Insureds"). MLM seeks a declaration stating that it has no duty to defend or to indemnify Insureds in a lawsuit styled *Ferguson v. Stout*,[1] pending in the Florida Circuit Court, Miami-Dade County (the "*Ferguson* Lawsuit"). The matter now comes before this Court on the parties' cross-motions for summary judgment. The parties have fully briefed and argued the motions, and the matter is ripe for disposition. For reasons set forth below, this Court hereby grants MLM's Motion for Summary Judgment, and denies Insureds' Motion for Summary Judgment.

### *Jurisdiction*

Plaintiff MLM is a mutual insurance company organized under the laws of Minnesota with its principal place of business in Minnesota. Defendant Stout is a resident of Virginia, and

---

[1] *Ferguson v. Stout*, No. 08-09767CA40 (Fla. Cir. Ct. 2008)

was at all times relevant a principal, agent, and employee of the Antonelli Firm. Antonelli, Terry, Stout & Kraus, LLP is a Virginia law firm. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

*Factual Background*

### 1. Ferguson Lawsuit

MLM's declaratory judgment action arises out of *Ferguson v. Stout*, a separate lawsuit instituted against Insureds in 2008. Under the applicable legal standard discussed *infra*, the Court must examine the allegations of the underlying complaint in *Ferguson* to determine whether MLM has a duty to defend. For this reason, the relevant allegations from the *Ferguson* Plaintiffs' Third Amended Complaint (the "*Ferguson* Complaint") are provided in detail.[2]

Andrew A. Andros ("Andros") was an inventor who founded and managed several communications companies over the course of his life. Having achieved success with the development and sale of CB radios and later paging technology, Andros turned his attention to the creation of wireless messaging technology that would allow consumers to send text messages through integrated networks. Andros formed Telefind Corporation in 1986 with the goal of realizing and marketing this technology. During the first few years of Telefind's existence, Andros received financial backing from a number of investors who would later become plaintiffs in the suit against Insureds. The principal investors included Jack and Karin Richards, Abbas Yousef, Khalifa Sherif, and Lars Bertil-Jonsson (the "Richards investors").

Through the late 1980s, Telefind developed and marketed "integrated alphanumeric paging services" in various U.S. markets. While these systems were a marked improvement over existing technology, they could transmit only a limited amount of data—approximately 250 characters—at one time. In order to improve the state of the art, Telefind began to research a protocol that would transmit data more rapidly through its network (the "high speed protocol"). Telefind also began to explore technology that would permit email to be transmitted from a laptop computer via the Telefind wireless messaging network to another laptop using the high speed protocol (the "Wireless Email Technology").

---

[2] The parties have agreed that the Third Amended Complaint is the operative pleading for the purposes of this declaratory judgment action. Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. 2 n.2.

In 1987, Telefind retained Donald Stout, a patent lawyer with Antonelli, Terry, Stout & Kraus, LLP, to perform patent prosecution services. Stout and his partners at the Antonelli Firm were impressed by Andros's business plan for Telefind, and they invested in the company. Before long, Stout was "increasingly immersed in counseling regarding the strategy and operations of the company." Third Am. Compl. at ¶ 32, *Ferguson v. Stout*, No. 08-09767CA40 (Fla. Cir. Ct. 2008) ("*Ferguson* Compl.").

In the late 1980s and early 1990s, Telefind's financial fortunes were mixed. The potential of the high speed protocol and Wireless Email Technology helped Telefind attract additional investment and lure potential acquirers. In spring 1990, the Richards Investors poured another $6 million into Telefind through a Panamanian corporation called Flatt Morris, S.A. The deal was structured in the form of a loan convertible to equity, and Flatt Morris took a security interest in Telefind assets. Stout, acting as a trustee for Flatt Morris, entered a collateral trust and security agreement with Telefind. The collateral trust agreement authorized Stout to hold all of Telefind's current and prospective intellectual property in trust for the benefit of Flatt Morris, including the high speed protocol and technology relating to the electronic transmission of wireless messages. The $6 million loan was ultimately converted into equity in Telefind.

Stout and his partners at the Antonelli Firm also invested additional equity in Telefind, including the conversion of some existing loans into equity. According to the *Ferguson* Complaint, the Antonelli Firm's role as Telefind's outside counsel was "becoming increasingly blurred with their role as investors in the company." *Id.* at ¶ 47.

Meanwhile, Stout became more actively involved in the management of Telefind. Stout recommended at one point that he and other investors act as a "hands on management committee." *Id.* at ¶ 39. He helped pursue potential investors or buyers for Telefind, and he participated in an unsuccessful negotiation to sell Telefind to France Telecom. Both Telecom and AT&T, another potential suitor, were particularly interested in acquiring the Wireless Email Technology.

Despite Telefind's sunny long-term prospects, its present financial state was precarious. Telefind had entered into a long-term leasing and financing agreement with Computer Leasco, Inc. ("Leasco") in 1989. Under the terms of the agreement, Leasco leased computers to Telefind for a monthly fee. Leasco obtained a security interest in Telefind assets, including some

3

intellectual property. By the end of 1989, Telefind was experiencing cash flow problems, and Leasco filed suit in January 1990 to recover delinquent payments. Stout, acting on behalf of Telefind, ultimately negotiated a "standstill agreement" with Leasco to provide Telefind more time in which to negotiate a sale to AT&T or Telecom.

In late 1990, at a Comdex tradeshow, Telefind demonstrated the completed invention of the Wireless Email Technology to key AT&T customers. Telefind was nonetheless unable to reach a sale agreement with either AT&T or Telecom. Fearing that the "standstill agreement" would not last, "Stout devised a legal strategy that he told [the] Richards Investors and Andy Andros would legally protect the Telefind investors' interest in the Wireless Email Technology, which was at risk of being lost to Computer Leasco in connection with its collection action." *Id.* at ¶ 55. Stout's strategy rested upon his belief that a "distinction" could be drawn under the patent laws between Telefind's paging technology, which was already subject to a number of patents, and the Wireless Email Technology. *Id.* at ¶ 59. According to Stout, the Wireless Email Technology could be placed in a separate entity, thereby protecting it from Telefind's secured creditors. Stout stressed to Andros and the Richards Investors that the strategy was legal, and that they would "lose their entire interest in the Wireless Email Technology if they did not follow his advice." *Id.* at ¶ 56.

The specifics of the strategy called for three engineers to obtain patents for Wireless Email Technology in their own names, as inventors, before assigning those patents to a new company formed by Stout. These engineers worked for a company called ESA Telecommunications, Inc. ("ESA") owned by Thomas J. Campana, Jr. ("Campana"). Telefind had hired ESA in years previous to develop Wireless Email Technology.

Stout emphasized that in order to protect the Wireless Email Technology from attachment by Leasco, Andros and the Richards Investors must have no documented ownership interest in the technology. According to the *Ferguson* Complaint, "Andros and the Richards Investors accepted this legal advice from Stout, subject to an understanding that they would continue to participate in any benefits associated with the Wireless Email Technology once the dust settled in connection with the Computer Leasco dispute." *Id.* at ¶ 60. The complaint continues, "[i]n accepting this advice from Stout, Plaintiffs relied upon Stout as legal counsel who was

4

purporting to represent their interests as the parties who were responsible for funding and developing the Wireless Email Technology." *Id.*

Stout and the ESA engineers implemented the strategy in May 1991 and March 1992 when they filed patent applications relating to the Wireless Email Technology and use of the high speed protocol (collectively the "Wireless Email Patents"). The three engineers were listed as patent inventors and Stout as patent counsel. Shortly thereafter, Campana obtained an assignment of the patent interests of the other two engineers, and Campana and Stout made a filing with the patent office showing that they both held an in interest in the Wireless Email Patents as co-owners.

In July 1991, a Michigan federal court entered a judgment for $3.8 million against Telefind in favor of Leasco. Three months later, Telefind filed for bankruptcy protection in the Southern District of Florida. During the bankruptcy proceedings, Stout "regularly communicated" with the Richards Investors through Bill White ("White"), their representative in America. Stout also sent written communications in which he represented himself as "working [with White] on behalf of the Richards Investors." *Id.* at 66.

In October 1991, Telefind initiated a proceeding in Southern District of Florida against Leasco, Flatt Morris, and other defendants seeking a determination as to the priority of their respective interests in Telefind's paging patents. According to the *Ferguson* Complaint, Stout and his law partners were, at this time, simultaneously representing the bankrupt (Telefind), a secured creditor (Flatt Morris), and a company claiming to own technology developed by Telefind (ESA). The Antonelli Firm itself was also listed as an unsecured Telefind creditor.

During this round of litigation, Stout and the Antonelli Firm made an offer to Flatt Morris to provide additional funds for legal expenses in exchange for increased equity ownership. Stout also insisted that he be granted power of attorney for Flatt Morris in order to negotiate a settlement with Leasco over patent ownerships. The Richards Investors "acceded to Stout's demands." *Id.* at ¶ 69. Through this maneuvering, Stout and White obtained a majority equity interest in Flatt Morris. Stout ultimately transferred power of attorney to White.

In June 1992, Campana, Stout, and White incorporated NTP, Inc. ("NTP"), and transferred the Wireless Email Patents into the new company. That November, the Southern District of Florida dismissed Telefind's bankruptcy, allowing the Michigan collection action to

proceed. In February 1993, the Michigan court granted an execution order against Telefind's intellectual property, including the Wireless Email Technology. NTP intervened, asserting its ownership of the Wireless Email Patents. To support NTP's claim, Stout and Campana asked that Andros sign an affidavit attesting that Telefind had no ownership interest in the Wireless Email Patents. Stout told Andros that the affidavit was important to protecting the investors' interests in the patents. Andros signed the affidavit. According to the *Ferguson* Complaint, "Andros faithfully followed the script provided to him by Stout, relying on his legal advice as to the proper course to follow in protecting his and the Richards' Investors interest in the Wireless Email Patents." *Id.* at ¶ 76. The Michigan court held that the NTP owned the Wireless Email Patents.

Andros passed away in January 2001. Later that year, NTP filed a patent infringement action in Virginia federal court. The defendant in the case was Research In Motion Limited ("RIM"), which had utilized wireless email transfer technology in its Blackberry system. RIM settled the suit in March 2006 for $612.5 million. In return, NTP granted RIM a perpetual license to the Wireless Email Patents at issue. The *Ferguson* Complaint alleges that the money was divided between Stout, Campana's estate, White, and others associated with NTP.

When the Richards Investors and Andros's surviving family contacted Stout regarding their interest in the proceeds of the RIM settlement, Stout denied the existence of any agreement conferring such an interest. Neither Andros's estate nor the Richards Investors received any portion of the settlement.

In 2008, the Richards Investors and the Andros estate (the "*Ferguson* Plaintiffs") brought suit against Stout, the Antonelli Firm, Campana, and White in the Florida Circuit Court for Miami-Dade County. *Ferguson v. Stout*, No. 08-09767CA40 (Fla. Cir. Ct. 2008). According to the complaint, the *Ferguson* Plaintiffs had "legitimate expectations . . . that [they] would share in the benefits associated with the Wireless Email Patents," and "injury and . . . actionable torts occurred when Defendants collectively decided to renege on their commitments and breached their duty to share with Plaintiffs the benefits derived from [the patents]." *Ferguson* Compl. at ¶¶ 99, 101.

The complaint's first alleged cause of action is for breach of fiduciary duty. The *Ferguson* Plaintiffs allege that a relationship of trust and confidence existed between Defendants

6

Stout and the Antonelli Firm on one side and Andros and the Richards Investors on the other. The complaint states:

> Stout served as legal counsel to Telefind, as well as to Flatt Morris, while he was a partner with [the Antonelli Firm]. Stout and his Antonelli partners used their position as legal counsel for both companies to gain an investment interest in each business. Andy Andros was a Telefind officer and investor. The Richards Investors were the principal investors in both Telefind and Flatt Morris, and funds from the Richards Investors were used to pay Stout's legal fees in connection with his legal work for both Telefind and Flatt Morris. Stout provided legal advice to Andy Andros and the Richards Investors in connection with the transfer of the Wireless Email Technology from Telefind to Campana and Stout, and, subsequently to NTP. In providing this legal advice, Stout traded upon his relationship of trust and confidence with Andy Andros and the Richards Investors. Stout and his Antonelli partners breached that relationship of trust and confidence when they reneged on Stout's commitment to share benefits received from the Wireless Email Technology and the Wireless Email Patents with Andy Andros and the Richards Investors.

*Id.* at ¶ 104. The *Ferguson* Complaint also alleges causes of action under breach of contract, unjust enrichment, and promissory estoppel theories. *See id.* at ¶¶ 108-22.

### 2. *Present Lawsuit*

On July 24, 2007, MLM issued to the Antonelli Firm "Professional Liability Insurance Claims-Made Policy No. 7405-06" (the "Policy"). This policy covered Antonelli for the period between October 25, 2007 and October 25, 2008, with liability limits of $10 million per claim and $10 million aggregate, and $5 million per claim with a $5 million aggregate for claims made arising out of acts, errors, or omissions occurring on or before October 25, 2006. *See* MLM Compl., Ex. A, Limits of Liability Endorsement.

The Antonelli Firm notified MLM of the *Ferguson* Lawsuit on August 15, 2008. Ten days later, MLM wrote to Insureds, and advised them that MLM would seek a declaratory judgment regarding MLM's duty to defend in the *Ferguson* matter.

On September 30, 2008, MLM filed the present declaratory judgment action in this Court. MLM seeks a declaration that, pursuant to the terms of the Policy, MLM has no duty to defend Insureds in the *Ferguson* Lawsuit. MLM has also reserved its right to recoup any amounts paid to Insureds as indemnity or defense costs upon a declaration from this Court that MLM has no duty to defend.

In November 2008, Insureds moved to dismiss or stay MLM's declaratory judgment action pending resolution of the *Ferguson* Lawsuit. This Court granted Insureds' motion, dismissing MLM's action without prejudice. The Fourth Circuit Court of Appeals reversed in December 2009, and remanded the case for further proceedings. *Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, No. 09-1049, 2009 WL 4506462 (4th Cir. Dec. 4, 2009).

Insureds filed a Motion for Summary Judgment on April 9, 2010. In their motion, Insureds argue that the allegations contained in the *Ferguson* Complaint trigger MLM's contractual duty to defend Insureds. Def.'s Mot. for Summ. J. 12. Insureds also contend that none of the exclusions included in the Policy apply under the present circumstances. *Id.* at 15-18.

MLM filed their Motion for Summary Judgment on the same day. MLM argues in their motion that they have no duty to defend Insureds because the *Ferguson* Complaint does not allege damages "resulting from the rendering or failure to render professional services." Pl.'s Mot. for Summ. J. 25. MLM further asserts that even if they would be otherwise responsible for defending Insureds in the *Ferguson* matter, two of the Policy's exclusions release MLM from any such responsibility: the Business Enterprise Exclusion, *id.* at 14, and the Specific Entity Endorsement. *Id.* at 24. MLM also contends that Insureds' five month delay in reporting the claim against Stout precludes coverage as to him. *Id.* at 27.

*Standard of Review*

*1. Summary Judgment*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Determination of whether an insurer has a duty to defend requires examination of (1) the policy language to ascertain the terms of the coverage and (2) the underlying complaint to determine whether any claims alleged therein are covered by the policy." *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 242 (4th Cir. 1995). Because this determination does not require the court to resolve any factual matters, it is appropriate for summary disposition. *See West Am. Ins. Co. v. Johns Bros., Inc.*, 435 F. Supp. 2d 511, 513-514 (E.D. Va. 2006) (finding summary judgment "especially

8

appropriate ... because the construction of insurance contracts is a legal question well suited for resolution by the court") (internal quotation omitted).

### 2. Contract Interpretation

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, so it must apply state law in interpreting the relevant contract provisions. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's laws should apply, the Court applies the choice-of-law rules of the Commonwealth of Virginia. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004); *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) ("generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage"). The policies in the present case were delivered to the Antonelli Firm in Virginia. Therefore, Virginia contract law will govern this Court's interpretation of the insurance policy between MLM and Insureds.

In Virginia, courts construe insurance policies under traditional rules of contract interpretation. "[W]ords used are given their ordinary and customary meaning when they are susceptible of such construction," *Salzi v. Virginia Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002), and ambiguous terms are construed against the instrument's drafter. *Fuisz*, 61 F.3d at 242. In the insurance context, this means that courts may enforce exclusions from coverage only where the exclusions "clearly and unambiguously bring the particular act or omission within its scope." *Floyd v. Northern Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993); *see also Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 475 S.E.2d 264, 266 (Va. 1996) ("Exclusionary language in an insurance policy is to be construed most strongly against the insurer, and the burden is upon the insurer to prove that an exclusion applies.").

*Analysis*

### 1. MLM's Duty to Defend

To determine whether an insurer has a duty to defend, Virginia courts apply the "Eight Corners Rule." *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 465 (E.D. Va. 2002). Pursuant to this rule, courts must examine two sources and two sources only. First, the court must review the language of the policy itself to determine the scope of the

coverage. *Fuisz*, 61 F.3d at 242. Second, the court must examine the underlying complaint to ascertain whether any of the claims contained therein fall within the policy's scope. *Id.*

When analyzing the claims contained in the underlying complaint, the court may not look beyond the complaint's allegations. *Town Crier, Inc. v. Hume*, 721 F. Supp. 99, 102 n.12 (E.D. Va. 1989). If these allegations reveal "any potentiality" that the policy could cover the claim, the insurer has a duty to defend. *Id.* Indeed, "[a]n insurer can avoid its obligation to defend the insured '[o]nly when it appears clearly [that the insurer] would not be liable under its contract for any judgment based upon the allegations.'" *America Online*, 207 F. Supp. 2d at 466 (quoting *Parker v. Hartford Fire Ins. Co.*, 278 S.E.2d 803, 805 (1981)); *see also Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 413 (4th Cir. 2004) (holding that duty to defend arises "whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy").

The Policy at issue in this case covers only those damages claims "arising out of any act, error, or omission of the insured," and "resulting from the rendering or failing to render professional services while engaged in the private practice of law . . . ." MLM Compl., Ex. A, Lawyers Professional Liability Insurance Claims-Made Policy ("Policy") 1. "Professional services," as the Policy defines them, "means legal or notary services for others, including, but not limited to services as administrator, conservator or guardian; executor or personal representative; trustee, escrow agent [or] title insurance agent . . . ." *Id.* at 3.

The question before the Court is whether *any* damages alleged in the *Ferguson* Complaint resulted from legal services rendered by Insureds. MLM offers two arguments as to why the *Ferguson* Plaintiffs' damages did not result from any such services. First, MLM asserts that Insureds and the *Ferguson* Plaintiffs were business associates, and the advice rendered by Insureds was not, therefore, "legal" in nature. While MLM does not dispute that an attorney-client relationship existed between Insureds and Telefind, MLM refers to Andros and the Richards Investors as "non-clients," Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply") 3, and contends that the *Ferguson* Plaintiffs "steadfastly avoid ever alleging an attorney-client relationship with Stout." Pl.'s Opp'n to Def.'s Mot. for Summ. J. 7.

MLM also emphasizes that Count I of the *Ferguson* Complaint, "Breach of Fiduciary Duty," alleges that "each of the three Defendants – Stout, Campana, and White – gave . . . the

exact same advice, and 'exploited' or 'traded upon' the exact same relationship of 'trust and confidence' in getting them to accept that advice." *Id.* at 7-8. MLM invites the Court to infer that because the *Ferguson* Plaintiffs used the phrase "relationship of trust and confidence" to describe the fiduciary breaches of attorney Stout as well as those of *non*-attorneys, the advice Stout provided was something other than "legal" in nature.

The Court holds that the advice offered by Stout to the *Ferguson* Plaintiffs regarding the protection of the Wireless Email Technology qualifies as professional legal services. In Virginia, "the relation of attorney and client exists, and one is deemed to be practicing law whenever he furnishes to another advice or service under circumstances which imply his possession and use of legal knowledge or skill." VA. RULES OF COURT § 6:1-1-pl. The *Ferguson* Complaint unmistakably alleges that Stout furnished services of this kind to the plaintiffs. According to the allegations, Stout "devised a legal strategy" for protecting the plaintiffs' interests in the Wireless Email Technology. *Ferguson* Compl. at ¶ 55. He proposed this strategy to Andros and the Richards Investors, and advised them to disclaim their interests in the technology in order to carry out the strategy. Andros and the Richards Investors "accepted this legal advice." *Id.* at ¶ 60; *see also id.* at ¶ 104 ("Stout provided legal advice to Andy Andros and the Richards Investors in connection with the transfer of Wireless Email Technology . . . ."). In doing so, they "relied upon Stout as legal counsel who was purporting to represent their interests." *Id.* at ¶ 60; *see also id.* at ¶ 76 ("Andros faithfully followed the script provided to him by Stout, relying on his legal advice as to the proper course to follow in protecting his and the Richards Investors' interest . . . ."). Moreover, throughout Telefind's bankruptcy, Stout sent regular communications to the Richards Investors in which he represented himself as working on their behalf. *Id.* at ¶ 66. Based on these allegations, the Court holds that Stout provided professional legal services to the *Ferguson* Plaintiffs.

MLM's argument regarding the language used in Count I of the *Ferguson* Complaint misses the mark. It is true that the plaintiffs used the same phrase—"relationship of trust and confidence"—in alleging breach of fiduciary duty by each of the three defendants. However, the *Ferguson* Plaintiffs also deliberately included the phrase "legal advice" in the allegations against Stout. These words cannot be written off as mere surplusage. On the contrary, their inclusion strongly suggests that while the *Ferguson* Plaintiffs may have had relationships of "trust and

11

confidence" with all three of the defendants, their relationship with Stout was of a different quality. Indeed, as the *Ferguson* Plaintiffs allege throughout their complaint, they relied upon Stout not only as a business associate, but as a legal advisor.

MLM next argues that, even if Insureds' alleged scheme to hide Wireless Email Technology from Telefind's creditors qualifies as "legal advice," the damages suffered by the *Ferguson* Plaintiffs resulted not from this advice, but from acts of "fraud and chicanery" that do not constitute the provision of legal services. Pl.'s Mot. for Summ. J. 26. The scheme itself, as MLM reasons, was actually a raving success; it did, after all, effectively deny Leasco's bid for Telefind's most treasured intellectual property. It was only after Stout subsequently refused to share the wealth generated by the Wireless Email Patents—an act that does *not* qualify as "professional services"—that the *Ferguson* Plaintiffs suffered any damage. *See* Pl.'s Reply 4-5.

The Court rejects this argument. MLM attempts to re-characterize the *Ferguson* Plaintiffs' damages as "resulting from" something other than the provision of professional services simply because Insureds are alleged to have breached legal duties while providing them. This interpretation unduly marginalizes the essential role played by Stout's status as a trusted attorney providing the plaintiffs with legal advice.

The underlying complaint chronicles the depth, duration, and complexity of Stout's association with the *Ferguson* Plaintiffs. Though originally hired by Telefind to prosecute patents, Stout quickly took on additional advisory responsibilities in the enterprise to develop and market Wireless Email Technology. He acted as a trustee for the Richards Investors' investment vehicle, Flatt Morris; Telefind entrusted Stout with all of Telefind's prospective intellectual property. Fearing that the "standstill agreement" that Stout had negotiated with Leasco would collapse, Stout formulated and pitched a strategy to Telefind's investors that he assured them was a legal means of protecting their interests in Telefind's most valuable commodity. He told the plaintiffs that he was acting as an attorney and in their interests. In a display of trust and confidence in Stout's services, the *Ferguson* Plaintiffs agreed to Stout's proposed legal strategy.

Taken together, the *Ferguson* allegations depict a sophisticated scheme conceived of, proposed, and executed by a man upon whose legal advice the plaintiffs relied—Donald Stout. The final step of the alleged "con"—Stout's refusal to share the Blackberry settlement with

Telefind's owners and investors—cannot simply be treated as one foul act occurring outside the larger context of the parties' long-running professional relationship. *See Continental Cas. Co. v. Burton*, 975 F.2d 1187, 1190 (4th Cir. 1986) (holding that defendant insurance company had duty to defend where insured attorney allegedly embezzled funds entrusted to him by clients); *Donnelly v. Transportation Ins. Co.*, 589 F.2d 761, 766 (4th Cir. 1978) (holding that "misuse by an attorney of property belonging to his client is beyond argument 'an act arising out of the performance of professional services'"). This Court holds that the damages claimed by the *Ferguson* Plaintiffs result from Insureds' practice of law, as that term appears in the Policy. Therefore, barring any applicable exclusions, MLM has a duty to defend Insureds in the underlying action.

*2. The Business Enterprise Exclusion*

Exclusion 3 of MLM's Policy with Insureds excludes from coverage "any claim arising out of professional services rendered by any insured in connection with any business enterprise: (a) owned in whole or in part; (b) controlled directly or indirectly; or (c) managed, by any insured, and where the claimed damages resulted from conflicts of interest with the interest of any client or former client or with the interest of any person claiming an interest in the same or related business enterprise." Policy 3. MLM argues that Stout's activities as an investor in Telefind, Flatt Morris, and NTP trigger this exclusion, relieving MLM of its duty to defend. The Court agrees.

Professional liability insurers frequently include business enterprise exclusions in their policies in order to avoid liability for an insured's business activities. *American Guar. & Liab. Ins. Co. v. Keiter*, 360 F.3d 13, 16 (1st Cir. 2004) (citing RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 34.27 (5th ed. 2000)). Insurers calculate liability insurance rates on the assumption that insured attorneys act solely in a legal capacity, and that their professional judgment is unaffected by personal interests. *Id.* at 17. Business enterprise exclusions diminish risk associated with an insured's decision to pursue business opportunities that may result in conflicts between the lawyers' best interests and those of his client. *Id.*

For the Business Enterprise Exclusion to apply in this case, three conditions appearing in the terms of the Policy must be satisfied. First, the claim must arise out of professional services rendered by Insureds. The *Ferguson* Plaintiffs' claims for breach of fiduciary duty, breach of

contract, unjust enrichment, and promissory estoppel all arise out of the legal advice rendered by Stout, so this condition is satisfied. Second, Insureds must have rendered these services "in connection with" *any* enterprises that Insureds wholly or partially owned, directly or indirectly controlled, or managed. Third, the *Ferguson* Plaintiffs' alleged damages must have resulted from a conflict of interest between Insureds and some person claiming an interest in the same or in a related business enterprise. *See* Policy 3. The Court will address these last two conditions in turn.

"In connection with," as the phrase appears in insurance policy exclusions, has been given broad meaning. *See, e.g., Metropolitan Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co.*, 793 N.E.2d 1252, 1255 (Mass. App. Ct. 2003) (defining "in connection with" as "related to, linked to, or associated with"); *Nationwide Mut. Fire Ins. Co. v. Nunn*, 442 S.E.2d 340, 343 (N.C. Ct. App. 1994) (recognizing that phrase "in connection with" has "much broader meaning than 'arising out of'") (citing *Cameron Mut. Ins. Co. v. Skidmore*, 633 S.W.2d 752 (Mo. Ct. App. 1982)). For a claim to fall under the business enterprise exclusion, this Court holds that it is not necessary that the claim arise out of legal services rendered directly *to* an enterprise owned, controlled, or managed by an insured. Rather, the claim must merely arise out of legal services rendered by insureds that *relate to* such an enterprise.

The first question before the Court is what "enterprises," if any, "relate to" the professional services that ultimately gave rise to the *Ferguson* claims. The claims for damages by the *Ferguson* Plaintiffs arise out of the legal advice rendered by Stout regarding the protection of Wireless Email Technology from Telefind's secured creditor. *See Ferguson* Compl. at ¶ 55. Stout's legal strategy, as he proposed it to the *Ferguson* Plaintiffs, required that Andros and the Richards Investors have no "documented direct ownership interest in the Wireless Email Technology . . . ." *Id.* at ¶ 60. This advice relates to the business endeavors of both Telefind and Flatt Morris. Telefind developed the technology that Stout's strategy called upon that company to relinquish. Flatt Morris was the investment vehicle of the Richards Investors, Telefind's "principal financiers." *Id.* at ¶ 43. As subsequent events have confirmed, the Flatt Morris investors had a fortune riding on Stout's strategy.

The specifics of the legal strategy called on Campana and two ESA colleagues to obtain patents for the Wireless Email Technology, and to assign those patents to a new company formed

by Stout. *Id.* at ¶ 58. Stout and White incorporated that new company, NTP, in 1992. Shortly thereafter, Stout and Campana, who had previously filed as co-owners of the Wireless Email Patents, transferred the patents into NTP. The legal strategy was unquestionably related to NTP as a business enterprise.

This Court also finds that Stout's scheme to protect Telefind's intellectual property from Leasco itself constituted a business enterprise. Stout's legal strategy called for the incorporation of a new business, and for coordinated action between Stout, Campana, the Richards Investors, and Andros. It was at least nominally undertaken to improve the financial position of those holding an interest in the Wireless Email Patents. The scheme was, therefore, a business enterprise that relates to professional services provided by Stout.

The next question before the Court is whether the *Ferguson* Complaint alleges that Insureds managed, partially or wholly owned, or directly or indirectly controlled any of these enterprises. Under the language of the exclusion, if the underlying claim arises from professional services rendered in connection with *any* such business enterprise, the policy does not afford coverage as to that claim. The Court finds that, while Insureds' "ownership," "control," or "management" of Telefind is debatable, this condition is plainly met with respect to Flatt Morris, NTP, and the coordinated scheme to protect the Wireless Email Patents.

As the *Ferguson* allegations make clear, Stout and Antonelli had equity ownership in Flatt Morris, which they increased over time into a controlling majority interest. They did so by extracting additional equity grants as compensation for legal services to Flatt Morris. *See Ferguson* Compl. at ¶¶ 68-71. This Court finds that, according to the allegations of the *Ferguson* Complaint, Insureds held a majority ownership interest in Flatt Morris.

The *Ferguson* Complaint also alleges that Insureds owned, controlled, and managed NTP. The legal strategy that Stout proposed to the *Ferguson* Plaintiffs expressly contemplated "a new company formed by Stout." *Id.* at ¶ 58. Campana, White, and Stout incorporated NTP in 1992, and Stout and Campana then transferred the Wireless Email Patents into the new business. NTP was essentially a shell corporation. It had no employees, and it listed the Antonelli Firm offices as its business address. NTP's only shareholders were White, Stout, Campana, Antonelli Firm attorneys, and their family members. *Id.*

Stout took the lead on hiring counsel to assist in the transfer of the Wireless Email Technology, and instructed this attorney on how to assist in Stout's scheme. *Id.* at ¶ 72. After prevailing in its lawsuit against Leasco, NTP filed a suit against RIM. In 2006, this litigation resulted in a $612.5 million settlement for NTP. Stout is alleged to have received $177 million, or roughly 30 percent of the total fund. *Id.* at ¶ 85. These allegations depict an enterprise managed and controlled by Stout—the very man who conceived of the enterprise's existence, and, along with Campana, infused it with value. The Court finds that Insureds are alleged to have owned, controlled, and managed NTP.

Lastly, the allegations also demonstrate that Stout managed and controlled the larger enterprise—the scheme to transfer the Wireless Email Patents from Telefind to NTP. Stout was the legal architect of the strategy, and its chief administrator. He extracted the patents' ownership rights from Telefind, directed Andros and the Richards Investors to disclaim any interests in the technology, and, through incorporation of NTP, consolidated his own control over the asset. The Court finds that the *Ferguson* Complaint alleges Stout's management and control over the enterprise to protect Telefind's patents from Leasco.

The final question the Court must answer is whether the *Ferguson* Plaintiffs' damages are alleged to result from a conflict of interest between Insureds and some person claiming an interest in the same or in a related business or enterprise. The Court finds that this condition is also met. Stout's scheme to protect Wireless Email Technology for the benefit of the *Ferguson* Plaintiffs entailed his complete control over a client's asset. After obtaining a multi-million dollar verdict in the RIM litigation, Stout refused to share the largesse with the persons he had advised to grant him that complete control. Assuming the allegations are true, this is a clear case of conflict of interest that resulted in damage to the *Ferguson* Plaintiffs.

To summarize, the *Ferguson* Complaint's claims arose out of legal advice rendered by Insureds. Insureds rendered these services in connection with the Telefind, Flatt Morris, and NTP enterprises. Flatt Morris and NTP were both owned, controlled, or managed by Insureds. The damages alleged in the complaint resulted from a conflict of interest between Insureds and the *Ferguson* Plaintiffs, who claimed an interest in NTP, Telefind, and Flatt Morris. The Court

holds that the conditions of the Business Enterprise Exclusion are satisfied, relieving MLM from its duty to defend Insureds in the *Ferguson* matter.[3]

For the foregoing reasons, it is hereby ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED, and the Defendants' Motion for Summary Judgment is DENIED.

Alexandria, Virginia
November 18, 2010

/s/
Liam O'Grady
United States District Judge

---

[3] The Business Enterprise Exclusion precludes Insureds from coverage under the Policy. As such, the Court has no need to address the parties' arguments regarding the Specific Entity Exclusion or late notice as to Stout.